**IN THE COURT OF APPEALS OF TENNESSEE**
**EASTERN SECTION AT KNOXVILLE**

FILED

May 13, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| BETH ANN GONZENBACH, | ) | HAMILTON CIRCUIT |
| | ) | |
| Plaintiff/Appellee | ) | NO. 03A01-9609-CV-00314 |
| | ) | |
| v. | ) | HON. L. MARIE WILLIAMS, |
| | ) | JUDGE |
| DAVID SCOTT GONZENBACH, | ) | |
| | ) | |
| Defendant/Appellant | ) | VACATED and REMANDED |

George M. Derryberry, Chattanooga, for Appellant
Leslie B. McWilliams, Chattanooga, for Appellee

**O P I N I O N**

INMAN, Senior Judge

**I**

These parties were divorced by a final decree entered on February 28, 1994 which approved a marital dissolution agreement (MDA).

On September 13, 1994, Mrs. Gonzenbach (Wife) filed a petition for Rule 60 relief, or for contempt or modification of the decree on the ground that husband had deliberately concealed information about future bonus or incentive income.

An evidentiary hearing was held on March 11, 1996 on the bifurcated issue of whether the final decree of divorce (which incorporated the MDA) should be set aside. The successor trial judge found that husband "either by inadvertence or intent" misled wife or her attorney by failing to make full disclosure of "the incentive compensation he was negotiating at the time the MDA was entered into," and set aside the final decree in its entirety.

This is a Rule 9(b) interlocutory appeal which we granted October 25, 1996. Our review is *de novo* on the record, accompanied by a presumption that the findings of fact

of the trial court are correct unless the evidence otherwise preponderates. RULE 13(d), TENN. R. APP. P. There is no presumption of correctness with regard to the trial court's determination of questions of law. *NCNB v. Thrailkill,* 856 S.W.2d 250, 153 (Tenn. App. 1993). Following a careful study of the record we are respectfully constrained to disagree with the judgment which is accordingly vacated.

## II

At the outset we observe that there is no evidence whatever in this record to justify the voidance of the entire judgment and accordingly we shall focus on the issue of whether the MDA portion of the judgment should be held for naught under the evidence presented.

## III

The MDA provided, *inter alia*, that husband would pay (1) $3,000.00 monthly support for three children notwithstanding their future attainment of majority, (2) $2,500.00 monthly alimony to wife with monthly increases of $250.00 on each April 14 until the youngest child reaches majority or graduates from high school, when the alimony would be reduced to $1,500.00 monthly, (3) all college costs for each child, and (4) one-half of all future salary increases and bonuses into a created educational trust. Substantial financial assets were apportioned.

This agreement was hammered out through intense negotiations over a period of six months. Each party was represented by experienced counsel. Husband was employed as a tax attorney by The Lupton Company, earning a substantial salary; wife was not gainfully employed outside the home.

## IV

As we deduced from the record, six months after the decree was entered The Lupton Company established a separate deferred compensation plan benefitting husband if it eventually vested over a period of years, and which was ultimately worth $2.5 million. It is inferable that this prospect generated an interest on the part of wife which was not previously extant, notwithstanding the remarkable *stipulation* that (1)

2

husband was unaware at the time of the divorce that he would be given this perquisite[1] and (2) that it was unrelated to any claim of fraud.

**V**

The claim of Rule 60.02 fraud[2] must be proved by clear and convincing evidence. *Duncan v. Duncan,* 789 S.W.2d 557 (Tenn. App. 1990). We review the evidence against this standard.

As we have seen, the evidence reveals that oral and written negotiations between the parties transpired over a period of six months. They enjoyed an upscale lifestyle; after the divorce complaint was filed they continued to see each other frequently, and discussed financial matters. At intervals their respective attorneys assumed the requisite negotiations. The issue of Husband's present compensation was discussed,[3] as was the equally important issue of future income, particularly any prospect of a bonus or incentive compensation. These discussions occurred not only between counsel, but between the parties in the absence of counsel.

Wife testified that she and husband were "together constantly" throughout December, 1993, and that husband told her he hoped to get some form of incentive compensation in the future based upon a percentage of Lupton investments, and that while nothing had been decided he believed that he would probably get 2% of some undescribed assets. Appropo of this, in September, 1993, Husband, through his attorney, offered,. in writing, a *percentage of any bonus* Husband might receive during the next two years. Wife's then counsel counter-proposed, by demanding one-half of "all assets accumulated by husband during his past, present, and future employment with The Lupton Company and John T. Lupton, his employer." This demand defined "assets" to include "bonuses, other property," and Rabbi Trust agreements, and was rejected by Husband.

---

[1]A Rabbi Trust, so called. An earlier such trust, with assets of $200,000.00 was apportioned by the MDA, and is not questioned.

[2]Rule 60.02 provides that the court may relieve a party from a final judgment for reasons of intrinsic or extrinsic fraud, misrepresentation or other misconduct of an adverse party.

[3]Concerning which Wife raises no question.

On December 20, 1993, a meeting was attended by Jack Lupton, Husband, and attorney Joel Richardson who represented The Lupton Company. The appellant says that the depositional testimony he gave about this meeting provided the 'main thrust' of Wife's argument that he perpetrated a fraud, justifying the setting aside of the MDA, which he denies.

The issue of incentive pay for Husband was discussed at this meeting, including the granting to him of a one percent partnership interest in each real estate investment. No conclusions were reached and according to *Wife,* the "parties agreed to reflect on the matters discussed and meet again in order to proceed to work through the terms of the definitive agreement," which would track the provisions of the arrangements between Lupton and one Charles Chitty, the Husband's precedessor in corporate office, who received compensation based upon the appreciated value of the assets for which he had managerial responsibility. No definitive agreement was reached at this meeting.

Significantly, there is no evidence that Lupton intended to bind himself or his company; he stated, "the parties will have to feel their own way, and any type of arrangement established now will be subject to change as the facts change from time to time."

During the negotiatory period, Wife believed that Husband, an apparently talented tax lawyer, would be awarded incentive compensation *in futuro.* His immediate supervisor, Charles Chitty, received such compensation, and there was no reason to believe that Husband, slated to succeed Chitty, would not also receive such future compensation. This fact seems to have been assumed, and was confirmed by Chitty in a surreptitious call to Wife after he had retired.

On November 2, 1993, Husband responded to an interrogatory that he had no employment contract with Lupton, and hence produced no documentation with respect to its terms. As we have noted, in December, 1993, the parties were together frequently. *According to Wife,* Husband told her that he would be receiving the same compensation package as Chitty, but for a lesser amount, and that the package was being negotiated. He thought the percentage of investments would be two percent. *All of this information was reported to Wife's attorney.*

4

On December 28, 1993, at his deposition, Husband was asked . . .

Q:      Will you also receive any merit or incentive pay or bonus pay in addition to your salary?

A:      Yes.

Q:      Tell me about that.

A:      It would be no different than the past on merit pay.

Husband's testimony continued that he and Lupton 'talked about' the possibility of a bonus, and that "I would say that it's possible that [it] could come into play in 1994," but that the decision 'will be made by Mr. Lupton."

The parties had a settlement conference on January 28, 1994 at the office of Husband's attorney. A proposed MDA was presented. Wife refused to sign it because "*you told me that you're getting a percentage of investments."* Husband responded, "*Beth, this is the best you're going to get. Take it."*

Wife's attorney advised her to accept the proposed MDA, because in her professional opinion the compensation agreement did not exist. Wife now says that she "did not want to sign the agreement," because "I know he's lying."

Wife concedes the evidence is confusing. It is easy to concur in this observation, since we think the evidence falls far short of proving fraud on the part of *Husband.* In fact, some aspects of *Wife's* arguments are baffling, because not only was she apprised by Chitty of the likelihood her husband would receive the bonus or incentive pay, but her Husband testified, on discovery, that he might receive "merit or incentive or bonus pay." There is no evidence in this record that a contract for such pay existed as of the hearing date, and it cannot rationally be extracted from this record exactly what Husband was "lying about." Months later, the employer awarded Husband with incentive pay along the lines Husband and Wife had frequently discussed, but this fact forms no basis for the accusations levelled at him. *Wife* had the clear option of proceeding to trial and thereby casting upon the trial judge the onus of determining from the evidence presented whether future incentive compensation was a viable issue.

In *Duncan, supra,* the husband was a partner in a security and alarm business. His proof at trial was that the value of his share of the business was between $250,000.00 and $400,000.00. The plaintiff wife's CPA testified at trial that the value

5

of the defendant's share of the business was $1.2 million. The trial court awarded the wife $790,000.00 as marital property and alimony *in solido.* The husband was awarded the rest of the marital estate, some $675,000.00, based upon a finding by the court that his share of the security business was worth $400,000.00.

While the wife's appeal was pending, the husband and his partner sold the business for $5.5 million, from which the husband received approximately $2.5 million. The wife, *inter alia,* filed a Rule 60 motion to set aside the original decree on the basis of the valuation of the husband's business. The trial court denied relief, and on appeal, this Court affirmed.

We pointed out that the party seeking Rule 60.02(2) relief must show by "clear and convincing evidence" that post judgment relief was warranted.

> Post judgment [Rule 60.02(2)] relief is warranted where the moving party proves with clear and convincing evidence the existence of conduct amounting to:
>
> > an intentional contrivance by a party to keep complainant and the Court in ignorance of the true facts touching the matter in litigation, whereby a wrong conclusion was reached, and positive wrong done to the complainant's rights.

The Court further stated:

> Both withholding evidence and the knowing use of perjured testimony can provide grounds for granting post judgment relief pursuant to Tenn. R. Civ. P. 60.02(2).

The following sequence of events were described:

> (a) At the time the divorce trial began in May, 1982, the defendant and the co-owner of his business decided they would consider selling the company because of the co-owner's health.
>
> (b) In July, 1982, the defendant contacted a business acquaintance who had previously expressed an interest in buying the company.
>
> (c) In August of 1982, the defendant responded to the prospect's questionnaire used by him in considering the acquisition of a business.
>
> (d) A final decree was entered in the divorce case during September, 1982.
>
> (e) In November, 1982, the defendant began "eyeball to eyeball" negotiations with another potential purchaser, Honeywell. These negotiations were unsuccessful.
>
> (f) The defendant next negotiated with a third potential purchaser, Allied Security, which made a $4 million to $5 million offer to purchase the business in January, 1983. The offer was not accepted.

6

(g) In April, 1983, defendant and his co-worker agreed to sell the property to the original inquirer for $5.5 million.

The court summarized the foregoing as follows:

> The proof shows that Mr. Duncan had <u>preliminary conversations during the trial</u> with a professional associate which eventually led to the negotiations resulting in the sale of the alarm business for $5.5 million. However, Mrs. Duncan failed to prove by clear and convincing evidence that, at the time of the divorce trial, Mr. Duncan knew or possessed information that his share of the business was worth more than $400,000.00.

The court further stated:

> We recognize Mrs. Duncan's skepticism concerning the trial court's evaluation of her husband's business. However, skepticism alone is not sufficient to set aside an otherwise final judgment. To do so, a party must meet Tenn. R. Civ. P. 60.02's requirements. There is no direct proof in this case that Mr. Duncan perjured himself or that he withheld information <u>in his possession at the time of trial</u> . . .

In *Brown v. Brown,* 863 S.W.2d 432 (Tenn. App. 1993), the trial court had entered on January 29, 1991 a decree approving and incorporating a marital dissolution agreement between the parties. On January 13, 1992, the defendant wife moved to set aside the decree, asserting, *inter alia,* that the plaintiff husband had not disclosed his true financial worth to her, so that the divorce decree should be set aside. In fact, the wife alleged that she had received $150,000.00 under the divorce decree, while the husband had received $3 million.

The trial court denied relief under Rule 60-02(2), and this Court affirmed.

The wife had asserted as a basis for relief that her husband had told her that "his financial condition was bad," and that " . . . she would receive all that he could afford."

We pointed out that "all I can afford" is a mere expression of opinion, which was not sufficient to form the basis of an accusation of fraud. The court also pointed out that the wife's employment with her husband, and familiarity with his various business interests, helped to defeat her claim of fraudulent concealment. The Court further stated:

> The only complaint is that plaintiff did not, without request, furnish full and exact details of the value of such properties and interests. With the defendant's general knowledge of the assets and her failure to demand financial details, there was no fraudulent concealment.

7

We think that the case at hand is substantially weaker than either *Duncan* or *Brown.* Husband testified, as did Wife, that he refused to agree to provide her directly with any share of any bonus, in light of the apparently generous support and alimony payments, bearing in mind that the MDA required him to *pay over to the children's educational trust one-half, net of taxes, of any bonus income.*

For all of which the judgment vitiating the final decree in its entirety is vacated and the case is remanded for all appropriate purposes, with costs assessed to the appellee.

_____
William H. Inman, Senior Judge

CONCUR:


_____
Houston M. Goddard, Presiding Judge


_____
Charles D. Susano, Jr., Judge